UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW BARNETT, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>BERNARD GARRIGAN, et al.,<br><br>    Defendants. | Case No. 20-cv-02585-VC<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Andrew Barnett and Nazanin Namazi bought a house in Ferndale, California, from Sarah Shevett and Edward Barry. A real estate firm called The Land Man Office brokered the deal, with agents of the firm participating on each side—Bernard Garrigan representing the buyers and Kyla Nored representing the sellers. About a year later, after they began experiencing mysterious illnesses, Barnett and Namazi discovered that the house was riddled with mold. They moved out and sued everyone involved, contending that the defendants knew about and hid the mold. After settling with the sellers, Barnett and Namazi pressed five claims against Garrigan, Nored, and The Land Man Office at a two-day bench trial. The claims are for negligence, intentional misrepresentation, negligent misrepresentation, concealment, and breach of fiduciary duty (against the individual defendants only).

**I**

The plaintiffs are domiciled in Oregon, the individual defendants are domiciled in California, and The Land Man Office is incorporated and has its principal place of business in California. There is therefore complete diversity among the parties. *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996). As the amount in controversy exceeds $75,000, this Court has subject-matter

jurisdiction. 28 U.S.C. § 1332(a). There is personal jurisdiction over the defendants because California is either their domicile or state of incorporation. All claims are brought under California law.

## II

### A

A few years ago, Barnett and Namazi went looking for real estate in Humboldt County. They wanted property on which to grow marijuana, and they became interested in a 202-acre parcel in Ferndale. Tr. 134.[1] Garrigan, a real estate agent with The Land Man Office, was responsible for the listing. *Id.* The plaintiffs entered a contract to purchase that land for $600,000 and made a one percent deposit. Tr. 248; Ex. 109. They also kept looking. Garrigan showed them an even larger property near Cape Mendocino that was listed for more than $7 million, which was beyond their means. Tr. 297. But they did find a second property just across the street from the first: 875 Oeschger Lane, a twelve-acre parcel with a house that had been converted from a barn without any permits or inspections. Tr. 136, 171, 328, 372. While the deal for the first land was still pending, Barnett and Namazi bought 875 Oeschger. Tr. 298. They never did close on the larger property, telling Garrigan that they had learned about "squatters" nearby. Tr. 301–02. But they began living in the house at 875 Oeschger, and the condition of that house led to this case.

Barnett or Namazi visited the 875 Oeschger Lane property at least twice before purchasing it. Tr. 135, 154, 217. On one visit, both Barnett and Namazi saw the property, but the house was locked and neither went inside. Tr. 217. Namazi never saw inside the house before the close of escrow. Tr. 240. Barnett visited the property on a second occasion, along with his sister-in-law. Tr. 305. Barry, one of the sellers, was there too. Tr. 305, 385. Garrigan showed them all the inside of the house. *Id.* No one saw or smelled mold during that walkthrough. Tr. 305–06, 385–86. They did see that a tree limb had fallen through the roof and created a significant hole.

---

[1] The trial transcript is available at Dkt. Nos. 232 and 235. Citations are to the transcript's native page numbers.

Tr. 151–52, 305. Garrigan asked Barnett if they would want an inspection done—given the state of the roof—but Barnett said no. Tr. 306, 338. Barnett and Namazi soon signed a contract to purchase the property for $230,000, structured as a down payment of $100,000, five years of monthly payments at 8% interest, and annual balloon payments of $26,000. Ex. 124 at 42. As part of the deal, the sellers hired someone to fix the roof. Tr. 232–34, 387–88; Ex. 114 (paid invoice).

Barnett and Namazi both signed various forms. One of those forms was a waiver acknowledging that their decision not to have an inspection done was against the advice of the brokers. Ex. 101. Another was an advisory recommending that they investigate environmental hazards such as mold because the brokers "do not have expertise . . . and therefore cannot advise" on such matters. Ex. 102. Yet another was an advisory describing the brokers' obligation to "make a reasonably competent and diligent visual inspection of the accessible areas of the Property and disclose . . . material facts or defects that the inspection reveals." Ex. 107. That form also reiterated the brokers' lack of expertise in mold and warned that mold is "often undetectable from a visual inspection, a professional general property inspection and even a structural pest control inspection." *Id.*

Barnett moved in sometime in December 2017, and Namazi arrived a few weeks later; the walls had been freshly painted. Tr. 136, 142, 229, 270. They didn't see any mold then, either. Tr. 143. The couple began growing marijuana on the land and stored twenty to forty pounds of it inside the house at a time. Tr. 143–44.

By late spring, Barnett and Namazi were feeling ill and cognitively impaired. Tr. 136, 160, 231. Barnett testified that his hair was falling out and that he was experiencing incontinence and nosebleeds. Tr. 137, 160. Their marriage was deteriorating as well: They were "at each other's throats." Tr. 137. Barnett initially thought that he was just getting old. *Id.* But they started to suspect mold, and after two "little cheap air test[s]" from a hardware store came back positive, they went looking and saw that mold was "everywhere": under the refrigerator, in the downstairs bathroom and bedrooms, in the upstairs bedroom, and on the south-facing wall under a sink.

Tr. 138, 229. In the bathroom, Barnett pulled back wood paneling and found mold behind it. Tr. 160. Elsewhere, the mold was growing up through multiple layers of paint. Tr. 138. This discovery came in November, about ten months after they moved in. Tr. 139, 231–33. By then, the couple was two payments behind on the mortgage, and a balloon payment was on the horizon. Tr. 165; Ex. 129. They had fallen behind because their marijuana crop was repeatedly failing, growing moldy while stored inside the house. Tr. 167. A neighbor advised them to move out, informing them that a previous tenant had also found mold in the house. Tr. 163–64. They did so. Tr. 138, 162. The couple made no further payments on the house, reasoning that they hadn't bargained for mold. Tr. 204.

**B**

The previous tenant who had encountered mold was Christine Mahoney.[2] She lived at 875 Oeschger Lane for a few months in 2016 with her late husband Eric Pfeffer and their young daughter. Tr. 42, 67. They rented the property from Shevett and Barry, the same sellers, while unsuccessfully negotiating to buy it. Tr. 42, 47. The house was "infested with mold" and had "significant water damage," in addition to being full of "bugs and slugs." Tr. 43. The house lacked proper heating and was constantly damp. Tr. 85. Mahoney worried about a tree limb hanging dangerously over the roof—the one that fell before Barnett and Namazi's purchase. *Id.* She once gently knocked the ceiling with a broom handle while clearing spider webs, and it gave way like "mush." Tr. 44, 68. Her mattress molded, as did her daughter's stroller. Tr. 44. Mahoney and her husband, who had cystic fibrosis, moved upstairs to get away from the worst of the mold. Tr. 81–82.

According to Mahoney, she and her husband (mostly her husband) complained about these problems during their negotiations with the sellers. Regarding the mold, Shevett and Barry suggested they use "Kilz" paint on it and then, once they owned the house, tear it down to the studs and put in new drywall. Tr. 69–70. The sellers said they'd re-done at least one room that

---

[2] Mahoney's last name also appears as Pfeffer, Hajny, or various combinations thereof. *See* Tr. 41, 76.

4

way before. Tr. 70. Mahoney and her husband kept negotiating despite the mold because they planned to build and live in a new house on the property. Tr. 101, 103. The sellers agreed to install a wood stove to deal with the dampness but initially resisted paying to deal with the tree. Tr. 85. Pfeffer and Barry, the husbands, discussed other work that could be done; Mahoney testified that she wasn't directly involved in those conversations. *Id.*

Mahoney knew that these negotiations involved The Land Man, and at least one discussion regarding terms happened in Nored's office.[3] Tr. 100. The one draft offer from Mahoney and Pfeffer that was introduced at trial stated that the property was to be taken in "as-is condition," and acknowledged that all existing improvements on the property were un-permitted. Tr. 93; Ex. 3 at 11–37. The draft proposed that the sellers would pay to trim the tree over the house, install a wood stove, and fix the house's water pressure. Ex. 3 at 13. At trial, Mahoney agreed that this was one of the last offers she and her husband had worked on and that it post-dated their discovery of the mold. Tr. 94. She wasn't sure why the written offer didn't mention any mold problems, as her husband was the one who dealt with Nored while she took care of their daughter. Tr. 94–97, 102. She also wasn't sure whether she was present when the document was drafted. Tr. 97. When it became clear that no deal would be reached, the sellers had Mahoney and Pfeffer move out. Tr. 110–11. At least two other tenants occupied the house before Barnett and Namazi arrived. Tr. 366.

Mahoney's oral testimony is corroborated by a handful of photographs: two photos of moldy walls near the hole that she accidentally poked in the ceiling, three photos of the moldy stroller, and two photos of the moldy mattress. Ex. 3 at 7–10. Mahoney took the pictures to show to Shevett and Barry, and she says she sent them over immediately. Tr. 76, 80. (The photos' dates and locations are a little odd, but Mahoney testified convincingly as to their origin, and the metadata discrepancies are not so far out of the ordinary as to seriously call the content or timing of the pictures into question.) Mahoney expressed confidence that she also shared the pictures

---

[3] Mahoney referred to Kyla Nored as Kyla Tripodi in her testimony; they're the same person.

with the brokers, but she wasn't sure whether she had shown them the pictures or mold in person or whether she had emailed or texted the pictures. Tr. 77–78. When asked with whom specifically she thought she had shared the pictures, Mahoney testified that Nored was "the main person that we dealt with." Tr. 77.[4]

### C

Needless to say, the brokers claim they didn't know about any mold at 875 Oeschger Lane. Garrigan, who everybody agrees had no contact with Mahoney, walked through the property with various potential buyers. Tr. 307. But he says he never saw, smelled, or heard about any mold. *Id.* He was not managing the property as a landlord; the sellers were. Tr. 311. And Barnett and Namazi had told him they were interested in buying multiple properties for their marijuana operation, including others much larger and more expensive than 875 Oeschger Lane, so he had a financial interest in making sure they were happy. Tr. 246, 294–96.

Nored testified that she walked through the property a "handful" of times over several years without seeing or smelling mold. Tr. 344. She stated that the sellers never told her of any mold problems. Tr. 345. She testified that she spoke with Mahoney and Pfeffer a few times, including once or twice in person, and drafted at least one written offer on the property for them. *Id.* But according to Nored, they also never mentioned mold—even while they did complain about the water pressure and the tree hanging over the house. Tr. 345–46. According to Nored, the first time she was told of any mold problems at the house was in late 2018, when Garrigan told her that Barnett had reached out to him about mold causing health problems for him and Namazi. Tr. 347. Around the same time, Shevett forwarded her an emailed complaint about mold from Barnett (with an added comment that there had never been complaints about mold before). Tr. 348; Ex. 10.

---

[4] The defendants contend that the photographs should be excluded because they were not disclosed by the plaintiffs. But Mahoney provided the photographs directly to the Court, and they were promptly filed on the docket. Dkt. No. 192. The defendants therefore received them at the same time as the plaintiffs, many months before trial. And Mahoney herself is not a plaintiff in this case. If Barnett and Namazi were technically required to disclose the photographs to the defense, their failure to do so was harmless. *See* Fed. R. Civ. P. 37(c)(1).

6

**D**

The sellers, Shevett and Barry, testified at trial and similarly denied knowledge of any mold at the property before the sale to the plaintiffs. They previously settled with Barnett and Namazi in exchange for a full release of liability. Tr. 368, 380. Shevett testified that she believed the complaints of mold were suspiciously timed, arriving as the plaintiffs fell behind on payments for the house (payments that were owed to her and her husband directly). Tr. 370. Barry, who had turned the barn into a residence, also denied any knowledge. Tr. 381, 395–96. He explained that tenants would communicate with Shevett about any problems and that he would periodically go to the house to fix issues. Tr. 382. He said he never met or spoke with Mahoney, and that he had talked with Pfeffer only once, in person, when he went to fix a pump. *Id.* He denied any discussions about mold or other problems. Tr. 383. He said he happened to be at the property to work on fixing the roof when Barnett did the walkthrough with Garrigan. Tr. 385. He arranged for a contractor to fix the roof, Ex. 114, although after Barnett and Namazi moved out he thought that the repairs hadn't been done properly and that the stove chimney was no longer properly protected from rain. Tr. 388–89. The house's gutters were also damaged such that water was running down the exterior walls. Tr. 389–90. At that point, he saw what he thought was "absolutely" mold on the first floor; he tore up that level's flooring before he and Shevett sold the property again. Tr. 390.

**III**

In civil trials, plaintiffs must generally prove facts by a preponderance of the evidence. That means they must show that each fact necessary to a claim is at least slightly more likely to be true than not. This standard applies to three of the key contested factual questions here: First, was there mold in the house at 875 Oeschger Lane when Barnett and Namazi lived there? Second, was that mold present before they bought the house? And third, did the brokers know about it?

Barnett and Namazi have presented strong evidence establishing that there was mold in the house when they lived there. Their own testimony was consistent and convincing: Their

marijuana crops molded; their store-bought mold tests were positive; and when they went looking, they saw mold behind paneling and elsewhere. They didn't notice mold sooner, either during Barnett's walkthrough with Garrigan or during the many months that they lived there, in part because it had been painted over. But eventually the mold had grown and become visible through the layers of paint. And while defense counsel called the existence of any mold at all a "big lie," Tr. 207, one of the defense witnesses (Barry) testified that he found mold after the plaintiffs moved out. Finally, no expert testimony is required to show that the mold was mold. Identifying mold is within a layperson's everyday experience. It's easy to conclude that there was mold.

      The plaintiffs have also established by a preponderance of the evidence that the mold predated their purchase. Barry thought that the mold came from the improperly fixed roof or the broken gutters, while defense counsel speculated that the plaintiffs had introduced mold into the house by storing their marijuana crops inside. The first theory is plausible, and the second may be possible. But Mahoney's testimony establishes by a preponderance of the evidence that there was mold in the house before the plaintiffs arrived. Mahoney came across as honest and credible. She explained in detail her experience living at 875 Oeschger with her family. For example, she recounted accidentally making a hole in a ceiling that was so damp that it was like "mush," and she has the photo she took to show Shevett and Barry the damage and the surrounding mold. She recalls discussing the sorry state of the house with those two, and she recalls their dismissive explanation that the house "is what it is"—a converted barn in a damp environment. Tr. 45. Her testimony that they advised her and her husband to cover the mold with Kilz paint and strip the house down after they purchased it rings true. By contrast, the sellers' testimony that they hardly ever met or spoke with any of their tenants or buyers, and that there were no complaints, rings false. For instance, Barry's testimony that they had essentially no contact with Mahoney and her husband makes little sense if they were discussing a sale of the property—something Shevett acknowledged they were doing. Tr. 365. And it's contradicted by Mahoney's testimony that the two couples ate meals together. Tr. 100. Although the sellers settled with the plaintiffs and face

no further liability, this record makes it seem likely that they knew they were selling Barnett and Namazi a moldy house.[5] More importantly, because mold is so hard to eradicate, the record establishes that the house was moldy when Barnett and Namazi purchased it.

The third key question is whether the brokers knew about the mold. Garrigan flatly denies it, and there's essentially no evidence that contradicts him. Nored denies it as well, but Mahoney is sure that she knew. Given that the sellers likely knew about the mold, one might infer that they told the brokers. But that would just be speculation, and the sellers would have had good reason to keep mold issues from the people trying to sell their property. Most brokers would walk away rather than risk being dragged into years of litigation over a moldy house. As to the brokers' denials, it's hard to gauge their credibility. It's difficult to prove a negative, so if the truth is that they were never told about any mold, there may not be much more they could say. On the other hand, if they did know about the mold, it's a pretty easy thing to deny.

For this question, then, Mahoney is again the decisive witness—especially as to Nored's knowledge. The defense tried to portray Mahoney as a liar and a friend of the plaintiffs. But as noted previously, she was an honest witness. And part of what made her believable was her frankness about what she remembered and what she didn't. She had first-hand knowledge of the mold. She was the one who found mold on her mattress, who had to move upstairs with her ill husband, and who struggled and failed to get the mold off her daughter's stroller. She held the broom that poked through the house's wet ceiling. She had specific memories of her husband discussing the mold problem with Barry. And she had some involvement in the negotiations, through Nored and The Land Man, to buy the property. But while Mahoney "talked about everything" with her husband, Tr. 96, she was candid that he was the one handling those negotiations, while she focused on their daughter. The second-hand nature of her knowledge of the discussions with the brokers is evident in her uncertainty and lack of detail regarding how the brokers were supposedly told about mold. Mahoney's conviction that she showed the brokers her

---

[5] Of course, if the sellers still faced liability, the record might have looked quite different.

photographs is tempered by her inability to say whether it was in person or by text or email. And her confidence that her husband discussed mold with the brokers seems to draw largely from her confidence that he discussed it with the sellers. For example, Mahoney testified that she was sure her husband discussed it with a man named Ed. Tr. 94. But that was Edward Barry, one of the sellers. *See* Tr. 94–96 (identifying "Sarah [Shevett]'s husband" as the man with whom her husband was discussing mold remediation). Furthermore, the limited documentary evidence from the negotiations to which the brokers were privy reflects the issues with the tree limb, the lack of heating, and the water pressure, but contains no mention of mold.

It's understandable that Mahoney has "some memory problems regarding a lot of this." Tr. 42. These events took place years ago during an extremely stressful time in her life. Her husband was dying of cystic fibrosis. She was caring for a young daughter. And they were living in a damp, moldy house. Memory can be unreliable for anyone, even under far better conditions. Here, Mahoney's memory runs out before reaching a point where the brokers were informed of the mold. That doesn't mean Mahoney is lying, and it doesn't even mean she's wrong: The record doesn't rule out the possibility that Nored in particular knew about the mold. But it's a sparse record, and Mahoney's testimony amounts to little more than an assertion that the brokers must have been told about the mold because the sellers were. Absent further evidence, that assertion falls short of satisfying the plaintiffs' burden of proof. On this record, the Court cannot conclude by a preponderance of the evidence that the brokers knew about the mold before the sale to Barnett and Namazi.[6]

---

[6] At trial, the plaintiffs offered what purport to be screenshots of Facebook messages between Mahoney and Namazi from late November 2018. Dkt. No. 108-4. In those messages (apparently their first communication), Mahoney tells Namazi that the house was moldy and that she and her husband had told the sellers and brokers as much. This exhibit was not properly produced to the defendants, so it cannot be considered at trial. It's also hearsay, and because the plaintiffs presented it at trial during Namazi's testimony, not Mahoney's, the messages cannot be properly considered as rehabilitation evidence. *See* Fed. R. Evid. 801(d)(1) (excluding prior statements of a testifying declarant from the definition of hearsay only when the declarant is subject to cross-examination about those statements). But even were the Court to consider these messages, the outcome would not change. The messages are not any more specific than Mahoney's trial testimony, and the same memory issues apply because they were sent two years after she left 875 Oeschger Lane.

IV

A

The failure to establish by a preponderance of the evidence that the brokers knew about the mold is fatal to the plaintiffs' claims for intentional misrepresentation and concealment. Intentional misrepresentation requires knowledge of falsity. *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 230 (2013). Concealment requires suppression of a fact with intent to defraud. *Graham v. Bank of America, N.A.*, 226 Cal. App. 4th 594, 606 (2014). Neither is established in this case.

The brokers' lack of actual knowledge also forecloses some theories of liability on the remaining claims. For example, had the brokers known about the mold and intentionally failed to disclose it to Barnett and Namazi, they would have breached their fiduciary duties. *Padgett v. Phariss*, 54 Cal. App. 4th 1270, 1286 (1997) (requiring "full and complete disclosure of all material facts"); *see also Ryan v. Real Estate of the Pacific, Inc.*, 32 Cal. App. 5th 637, 646 (2019). But brokers can't disclose information they don't possess. For the same reason, the plaintiffs cannot prevail on a theory that the brokers knew about the mold but accidentally failed to disclose it.

B

Proof of actual knowledge of the mold is not required for the three remaining claims—negligence, negligent misrepresentation, and breach of fiduciary duty. There are essentially two theories of liability left. The first is that the brokers' representations misled the plaintiffs and gave them unfounded assurances that the house had no mold—essentially a breach of a duty to communicate clearly. That could be negligent misrepresentation, for instance, which requires a showing that the brokers had "no reasonable grounds" for their representations about the house. *Chapman*, 220 Cal. App. 4th at 231. Or it could be a breach of fiduciary duty, such as when a broker confidently conveys a crucial fact about a property without mentioning that he is just repeating what the sellers told him. *Salahutdin v. Valley of California, Inc.*, 24 Cal. App. 4th 555, 560 (1994). But the plaintiffs have not established any such failure here. They have not

demonstrated that the brokers oversold their confidence in the quality of the house. Garrigan asked Barnett if he wanted an inspection due to the tree branch sticking through the roof (which plainly could have allowed water into the house, causing mold). Moreover, the paperwork for the transaction recommended that the plaintiffs have an inspection done for issues like mold and repeatedly reminded them that the brokers were not mold experts.

The plaintiffs' final theory is that the brokers had a duty to investigate and therefore should have discovered the mold. That could be either negligence or a breach of fiduciary duty, although the former is subsumed by the latter because a fiduciary is held to a higher standard of care. At minimum, the brokers had a statutory duty to conduct a "reasonably competent and diligent visual inspection" of the property. Cal. Civ. Code § 2079(a). (This requirement protects buyers even when the broker represents only the seller.) Here, both Garrigan and Nored conducted such an inspection by walking through the house on multiple occasions. It was reasonable that they didn't notice any mold when they did so. Indeed, Barnett also didn't notice any mold when he walked through the house, and it took him and Namazi the better part of a year living there to even suspect it. Similarly, Mahoney and her husband seem to have lived in the house for some time before discovering mold. From the experiences of the people who lived there, it's safe to conclude that the mold was not apparent and could not be discovered even by spending an extended time inside. And because the statutory inspection duty does not extend to "areas that are reasonably and normally inaccessible," the brokers were not required to peel back wood paneling or scrape away paint as part of their visual inspection. Cal. Civ. Code § 2079.3.

The plaintiffs rightly point out that because the brokers were representing them in this transaction, they owed a "fiduciary duty of utmost care." *See* Cal. Civ. Code § 2079.16. That common law duty, "unchanged by" and "substantially more extensive than" the statutory visual inspection, requires "the highest good faith and undivided service and loyalty." *Field v. Century 21 Klowden-Forness Realty*, 63 Cal. App. 4th 18, 25 (1998). There is no single course of conduct always required of brokers. "The facts that a broker must learn, and the advice and counsel required of the broker, depend on the facts of each transaction, the knowledge and experience of

the principal, the questions asked by the principal, and the nature of the property and the terms of the sale." *Id.* The plaintiffs opted not to present expert testimony at trial regarding the appropriate standard of care for a professional real estate broker. That means that the appropriate question is whether the brokers breached their duties to the plaintiffs in a manner "obvious to laymen." *Ryan*, 32 Cal. App. 5th at 644–45. Would "anyone who hired a real estate broker" for this transaction expect that broker to do more than the defendants did here? *See id.* at 646.

The answer is no. On this record, the brokers' conduct was acceptable. The plaintiffs were primarily interested in land on which to grow marijuana. They were considering buying multiple properties, and the two adjacent properties had obviously nontraditional structures. One buyer, Namazi, was content to purchase 875 Oeschger Lane without ever going inside the house. The other, Barnett, did tour inside and saw the roof damage—but was unperturbed. Garrigan asked if he wanted an inspection, and he said no. In writing, the brokers recommended inspections. The plaintiffs signed to acknowledge that recommendation but still did not have any inspections done. These circumstances indicated that the buyers were not very concerned with the condition of the house, perhaps because their interest was primarily in the land. The brokers' conduct put them on notice that there could be hidden problems with the house. The brokers were not required to prevent them from buying the property. Nor were the brokers required to pay for inspections that the plaintiffs did not want.

It's true that a broker's knowledge of "red flags" may trigger a more specific duty to investigate. *See Padgett*, 54 Cal. App. 4th at 1282. Here, the plaintiffs argue that because Garrigan steered them away from the larger property across the street over mold concerns, he should have done more to verify that 875 Oeschger Lane was mold-free. But that argument falters on the plaintiffs' own testimony. They bought 875 Oeschger Lane while still under contract to buy the larger property, not after; they were looking to acquire multiple tracts of land. And they testified that they abandoned their deposit on the larger property because of squatters, not mold. Tr. 181; Ex. 120. Garrigan's credible testimony also establishes that the structures on the larger property were uninhabitable because one had decades-old landslide damage and

13

another was a barn with a dirt floor, not because they were moldy. Tr. 300–01. Those facts were not "red flags" that Garrigan needed to do a special mold investigation next door. The hole in the roof might be a true "red flag" as to the condition of the property. But Garrigan showed it to Barnett, it was fixed as part of the transaction, and the various advisories made clear that the brokers were not guaranteeing against mold.

Taken as a whole, the trial record does not show that the defendants breached their duties to the plaintiffs by failing to discover the mold.

**V**

Barnett and Namazi presented strong evidence that the house they purchased at 875 Oeschger Lane was riddled with mold. Mahoney's testimony establishes that the mold had been present in the house for a long time and that the sellers likely knew about it. This experience was very difficult, upsetting, and disorienting for the plaintiffs. And while most of their damages evidence was inadmissible because it was not properly disclosed to the defendants, it's evident that the purchase of this property ended up being financially devastating for Barnett and Namazi.

At the end of her testimony, when pressed by defense counsel about the differing stories in this case, Christine Mahoney said: "[M]e and [Nored] both know what the truth is." Tr. 128. This Court can't say who should sleep well at night. The Court can only weigh the evidence and apply the standard of proof. On this record, the Court cannot conclude that the brokers knew about the mold. And they did not otherwise breach a duty to the plaintiffs by misleading them or failing to investigate further. Garrigan, Nored, and The Land Man Office are therefore not liable to Barnett and Namazi.[7]

---

[7] The defendants request an award of attorneys' fees as a sanction under 28 U.S.C. § 1927. They contend that the plaintiffs and their counsel either pressed frivolous claims and arguments or, knowing that any recovery might be fully offset by the settlement with the sellers, pursued their claims in bad faith to harass the brokers. This request is denied. The plaintiffs' pursuit of their claims was not frivolous, and their counsel's sometimes scattershot arguments were not sanctionable—especially considering that counsel was willing to take on a messy case at a very late stage. As to the issue of a potential damages offset, it seems that defense counsel still doesn't grasp that any offset would not have precluded entry of judgment against the defendants. There

**IT IS SO ORDERED.**

Dated: June 29, 2023

_____
VINCE CHHABRIA
United States District Judge

---

were good reasons for both sides to settle this case before trial, but either side was entitled to try the case.
     The defendants' other request for an award of costs is denied without prejudice to a renewed request in accordance with Local Rule 54-1.